ANDRÉ BIROTTE JR.
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
RICHARD M. PARK (Cal. Bar No. 236173)
Assistant United States Attorney
    Room 7516, Federal Building
    300 North Los Angeles Street
    Los Angeles, California 90012
    Tel:  (213) 894-3275
    Fax:  (213) 894-7819
    Email:   richard.park@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| GLENN EARL ROBERTS, | ) Case No: CV 11-01455 R |
| | ) |
| | ) **FINDINGS OF FACT AND** |
| Plaintiff, | ) **CONCLUSIONS OF LAW** |
| | ) |
| v. | ) Trial Date:  Nov. 8, 2011 |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) Hon. Manuel L. Real |
| Defendant. | ) United States District Court |
| | ) |
| | ) |

///
///
///
///
///
///
///
///
///
///

After trial and review of the evidence, the Court finds as follows:

I. **FINDINGS OF FACT**

1. Defendant United States is sued in this matter based on the medical care Plaintiff received from the U.S. Department of Veteran's Affairs.

2. At all relevant times, John Williams, D.P.M. and Lana Lem (maiden name: Hau), D.P.M., were federal employees acting within the course and scope of their employment.

3. On or about February, 2007, Plaintiff Glenn Earl Roberts, a 59-year old male, was diagnosed with degenerative joint disease (arthritis) of the left ankle.

4. The VA doctors recommended that Mr. Roberts undergo a left ankle fusion (arthrodesis), where surgeons would, among other things, fuse the ankle joint in place with two surgical screws. An ankle fusion was intended to preclude motion and thereby eliminate pain in the ankle joint.

5. On August 24, 2007, Mr. Roberts visited Dr. Alexander Tischler, a private orthopedic surgeon to obtain his opinion about the fusion procedure.

6. Dr. Tischler observed that Mr. Roberts had a "classic arthritic joint" and concluded that fusion of the ankle was appropriate. He noted also that Mr. Roberts had a "good supple talar joint" and, therefore, recommended against a procedure that would fuse other joints in addition to the ankle joint.

7. On September 13, 2007, Mr. Roberts visited the VA for a pre-operative examination, x-rays, and a discussion of the risks and benefits of ankle fusion with Drs. Lana Lem and John

Williams.

8. Mr. Roberts elected to have surgery after being informed, and consenting to, the risks attendant to a bone fusion.

9. He signed the surgical consent form, which, among other things, cautioned that "[k]nown risks of this treatment/procedure include, but are not limited to: Failure of fusion, solidifying and requiring additional procedures.  Loss of alignment requiring additional procedures."

10. Dr. Lem also told Mr. Roberts, among other things, that she would be performing the surgery with an attending physician.

11. On September 18, 2007, a left ankle fusion was performed by two podiatric surgeons, Drs. Lem and Williams, at the VA Loma Linda Medical Center.

12. At that time, Dr. Lem was a resident and Dr. Williams was the attending surgeon.

13. Prior to this ankle fusion, Dr. Lem had participated in at least 100 fusions, including three ankle fusions.  She had primary responsibility on approximately 78 fusions, including one ankle fusion that occurred merely three months before, on June 16, 2007.

14. In addition, Dr. Williams, the attending surgeon, was well experienced having been involved with 30-50 ankle fusions in his medical career.

15. The surgical plan for Mr. Roberts involved fusion of the tibia and talus bones to eliminate arthritic pain in the ankle joint.  The surgery went according to plan with no

complications.

16.   During the surgery, the alignment of the ankle and foot was checked clinically by Drs. Lem and Williams. Additionally, a fluoroscopy was taken to check for proper alignment prior to two surgical screws being inserted to fuse the ankle joint in place.  According to the surgical report, the alignment of the foot and ankle was noted to be "excellent." Both Drs. Lem and Williams testified that the foot and ankle were aligned properly and the foot was placed in proper plantigrade position.

17.   An x-ray taken within hours after the surgery by Dr. Khin Tint, a board-certified radiologist, confirmed that the position of the ankle joint was normal and the position of the heel was satisfactory.

18.   The Court finds the testimony of Drs. Lem, Williams, and Tint to be credible.

19.   After surgery, VA healthcare providers observed that Mr. Roberts was developing further progression of subtalar arthritis.  The doctors also noted that Mr. Roberts started to complain about pain in his ankle and spoke about walking on the outside of his foot.

20.   On December 18, 2008, Mr. Roberts complained of increasing pain in his ankle area.  He explained that when he eliminates the inversion (rolling-in motion) and eversion (rolling-out motion) of his foot by walking against his bed frame, he can walk pain-free.

21.   The subtalar joint governs the rolling-in and rolling-out motion of the foot.

22.   On March 26, 2009, Mr. Roberts was found to have severe arthritis of the subtalar joint and a varus deformity in the hindfoot.

23.   A varus deformity in the hindfoot results in the heel having the appearance turning inward.

24.   VA doctors observed that Mr. Roberts complained of increased pain and reduced range of motion in his subtalar joint.  VA doctors also confirmed that Mr. Roberts had arthritis of the subtalar joint and demonstrated a rearfoot varus deformity.

25.   On November 20, 2009, VA doctors injected pain medication into Mr. Roberts' subtalar joint.  The injection resulted in pain relief.

26.   Both Plaintiff's and Defendant's retained experts believe that Mr. Roberts currently has a completely fused left ankle joint.

27.   A fused joint does not move or cause pain.

28.   Defendant's retained expert, Dr. Tye Ouzounian, a board-certified orthopedic surgeon specializing in foot and ankle disorders, opined that Mr. Roberts' ankle joint was properly aligned at the time of surgery, and has not moved since then.  Dr. Ouzounian also testified that Mr. Roberts' current pain and inverted walking is not related to any deformity in his ankle joint.

29.   Dr. Ouzounian opined that a subtalar fusion is now necessary and appropriate to relieve Mr. Roberts' pain.  The need for the subtalar fusion is unrelated to the ankle fusion.

30.   Dr. Ouzounian has performed 300 to 500 major joint

fusions and performs such surgeries as a regular part of his
practice.  Dr. Tauber, Plaintiff's retained expert, has not
performed any ankle fusions in the last five years and merely
one to two ankle fusions in the last ten years.

31.  Dr. Ouzounian has authored and published over 41
articles on foot and ankle issues, including two articles
specifically on ankle arthrodesis.  Dr. Ouzounian has also
authored a textbook chapter on ankle arthrodesis.

32.  The Court finds that the testimony of Defendant's
retained expert, Dr. Ouzounian, is more credible than the
testimony of Plaintiff's retained expert, Dr. Jacob Tauber.

**33.**  Any Finding of Fact which is properly deemed a
Conclusion of Law shall be considered a Conclusion of Law.

**II.  CONCLUSIONS OF LAW**

1.  In an action brought pursuant to the Federal Tort
Claims Act ("FTCA"), 28 U.S.C. §  2671 et seq., the law of the
place where the allegedly negligent act occurred governs the
substantive law applied.  See 28 U.S.C. §§ 1346(b).

2.  To have a cognizable claim under the FTCA, the claim
must arise from the negligent or wrongful act of a government
employee acting within the scope of his or her employment "under
circumstances where the United States, if a private person,
would be liable to the claimant in accordance with the law of
the place where the act or omission occurred."  28 U.S.C. §
1346(b); Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 936,
97 L.Ed. 1427 (1953).

3.  California law applies to the instant suit because the
ankle fusion was performed at the VA Medical Center in Loma

Linda, California.

4.   Under the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.  28 U.S.C. § 2674.

5.   Under the FTCA, Plaintiff's damages, if any, are limited to the amount claimed administratively.  See 28 U.S.C. §2675(b).

6.   To prove medical malpractice under California law, Plaintiff must establish: (1) the duty of VA healthcare providers to use such skill, prudence, and diligence as other members of their profession commonly possess and exercise; (2) that VA healthcare providers breached that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the VA healthcare providers' negligence.  See, e.g., Hanson v. Grode, 76 Cal. App. 4th 601, 606 (1999); Gami v. Mullikin Med. Ctr., 18 Cal. App. 4th 870, 877 (1993) (reciting elements of medical negligence claim).

7.   As a general rule, the testimony of an expert witness is required in every professional negligence case to establish (i) the applicable standard of care, (ii) whether that standard was met or breached by defendant, and (iii) whether any negligence by defendant caused the plaintiff's damages.  See Scott v. Raybrer, 185 Cal. App. 4th 1535, 1542 (Cal. App. 2d Dist. 2010)(citing Flowers v. Torrance Memorial Hospital Medical Center, 8 Cal. 4th 992, 1001 (1994).

8.   "The standard of care in a medical malpractice case

requires that medical service providers exercise . . . that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." Barris v. County of Los Angeles, 20 Cal. 4th 101, 108 n.1 (1999).

9.   Thus, a physician breaches the standard of care only if the physician's action is "[a] deviation from the standard of care that his peers consider appropriate in the situation." Burgess v. Superior Ct., 2 Cal. 4th 1064, 1081 (1992).

10.   Plaintiff has failed to prove that the physician's peers would consider his or her act to be blameworthy to constitute a breach of the reasonable standard of care.   Id.

11.   In this case, the standard of care for an ankle fusion is the same whether the procedure is performed by a podiatrist or an orthopedic surgeon.

12.   The burden of proof with respect to causation similarly rests with Plaintiff.   See Vasquez v. Residential Investments, Inc., 118 Cal. App. 4th 269, 288 (2004).

13.   Causation must be proven within a reasonable medical probability based upon competent expert testimony.   See Bromme v. Pavitt, 5 Cal. App. 4th 1487, 1489 (1992) (citing Jones v. Ortho Pharmaceutical Corp., 163 Cal. App. 3d 396, 402-403 (1985)).

14.   "A tort is a legal cause of injury only when it is a substantial factor in producing the injury."   Soule v. GM Corp., (1994) 8 Cal. 4th 548, 572.

15.   Under California Civil Jury Instruction ("CACI") 430:
    A substantial factor in causing harm is a factor that a

1   reasonable person would consider to have contributed to the
2   harm.  It must be more than a remote or trivial factor.  It
3   does not have to be the only cause of the harm.  [Conduct
4   is not a substantial factor in causing harm if the same
5   harm would have occurred without that conduct.]
6   CACI 430 (2010).
7   16.  The Medical Injury Compensation Reform Act of 1975
8   ("MICRA") imposes a $250,000 cap on non-economic damages awards
9   in professional medical negligence actions:
10   In no action [for injury against a health care
11   provider based on professional negligence,] shall
12   the amount of damages for noneconomic losses exceed
13   two hundred fifty thousand dollars ($250,000).
14   Cal. Civ. Code § 3333.2(b).
15   17.  MICRA applies to FTCA actions against Defendant United
16   States of America.  See Hoffman v. United States, 767 F.2d 1431,
17   1437 (9th Cir. 1985).
18   18.  The ankle fusion surgery was consented to by
19   Plaintiff.
20   19.  The ankle fusion performed by Drs. Lana Lem and John
21   Williams met the applicable standard of care.
22   20.  The medical care provided by VA healthcare providers
23   met the applicable standard of care.
24   21.  No act or omission by Drs. Lem or Williams, or those
25   of other VA healthcare providers, were the legal cause of any
26   injury to Plaintiff.
27   22.  Plaintiff has no economic damages as a result of the
28   ankle fusion.

23.   Plaintiff has no non-economic damages as a result of the ankle fusion.

24.   Any Conclusion of Law which is properly deemed a Finding of Fact shall be considered a Finding of Fact.

25.   Judgment will be entered for Defendant United States of America.

DATED: November 28, 2011

_____
HON. MANUEL L. REAL
UNITED STATES DISTRICT JUDGE